## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Eric Mercer, being duly sworn, state the following:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have worked there since January 2020. I am currently assigned to the Bridgewater, Massachusetts, Field Office. Prior to my employment with the ATF, I was employed as a Trooper with the New Hampshire State Police from 2018 to 2020. As an ATF Special Agent, I have training and experience regarding investigations involving firearms and narcotics trafficking and the possession of firearms by prohibited persons, including felons, parolees, illegal aliens, narcotics users, and narcotics traffickers. I have additionally received training and experience conducting investigations involving the possession and use of firearms in violent crime and narcotics offenses. As a result of my training and experience, I am familiar with methods commonly utilized by firearms and narcotics traffickers, as well armed offenders, in conducting their business.

2. I have participated in various aspects of firearms and narcotics investigations, including physical surveillance, surveillance of controlled purchases involving undercover agents and/or cooperating witnesses, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and the debriefing of defendants, informants, and witnesses who had personal knowledge regarding firearms and narcotics trafficking organizations.

3. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws.

4.      This affidavit is being submitted in support of a criminal complaint and arrest warrant for Floriano DE SOUZA. There is probable cause to believe that DE SOUZA has committed the crime of Conspiracy to Engage in the Business of Dealing in Firearms Without a License in violation of 18 U.S.C. § 371.  During an ATF investigation, a cooperating witness ("CW-1") working for the ATF made controlled purchases from targets of the investigation in the District of Massachusetts, resulting in arrests for federal firearms and narcotics offenses.  In the aftermath of the arrests, DE SOUZA threatened CW-1 (and his/her family) that, if CW-1 did not pay approximately $70,000 for lost illegal proceeds arising from seized firearms belonging to the conspiracy, they would be harmed.

5.      CW-1 and CW-1's family members have requested that their identities not be revealed for fear of reprisal or harm to their physical safety.

6.      The information contained in this affidavit is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillance, information from CW-1, public records, database checks, and other investigations. The dates and times in this affidavit are approximate. Because this affidavit is submitted for the limited purpose of supporting issuance of an arrest warrant for DE SOUZA, I have not presented every fact learned during the investigation, but only that information necessary to fully support probable cause for arrest warrants.

## **PROBABLE CAUSE**

7.      The ATF and HSI, in conjunction with state and local law enforcement, have been involved in a multi-defendant investigation involving the illegal possession and trafficking of firearms. The defendants in this investigation are predominantly illegal aliens from Brazil, many

of whom are suspected members and/or associates of Brazilian based criminal organizations. One of the individuals investigated was Talles Provette DE FARIA.

8. On the evening of February 12, 2024, a Barnstable Police Department ("BPD") officer was working a plain-clothes duty assignment in the Town of Barnstable, while operating a fully functioning cruiser with emergency lights and sirens. At approximately 9:50 p.m., the officer observed a 2009 BMW X6 approach the intersection of Main Street and Center Street. The officer observed the vehicle to have no front license plate and the passenger side taillight was out. The officer subsequently initiated a motor vehicle stop in the vicinity of Main Street and Pearl Street. The officer approached the vehicle and identified the driver, and lone occupant, as DE FARIA. As a result of the motor vehicle stop, BPD confirmed DE FARIA did not possess an active driver's license and a tow was requested for the vehicle. Officers conducted a motor vehicle inventory prior to the tow and located a Pietro S.P.A Beretta, Model 85FS, .380 caliber pistol, serial number U03393Y, loaded with eight rounds of .380 caliber ammunition, in the seat back pocket of the driver's seat. After confirming DE FARIA did not possess a Massachusetts license to carry firearms, DE FARIA was placed under arrest.

9. During March 2024, CW-1 informed agents that DE FARIA was involved in the possession and trafficking of firearms on and around the Cape Cod Massachusetts area. CW-1 further reported DE FARIA told him/her that he had a source of supply for illegal firearms. DE FARIA sent CW-1 photographs of two handguns, and a box of ammunition, that he had available for sale. I later directed CW-1 to arrange the purchase of the firearms and ammunition from DE FARIA.

10. On April 24, 2024, CW-1 made a controlled purchase of two (2) 9mm pistols and ammunition from DE FARIA in Plymouth, MA. Prior to the controlled purchase, investigators

met with CW-1 at a pre-determined location to conduct a pre-operational briefing. CW-1 was equipped with electronic surveillance equipment, as well as an undercover ("U/C") vehicle, to record and monitor the transaction. Agents provided CW-1 with government funds in order to purchase the firearms and ammunition. CW-1 and the U/C vehicle were searched for contraband and currency with negative results.

11. Surveillance personnel were assigned to the area of the Home Depot parking lot in Plymouth, MA, and CW-1 was under constant surveillance by investigators during the operation. While at the Home Depot, investigators observed a black Ford Fusion (MA 5VFP11) arrive at the Home Depot lot and park next to the U/C vehicle. DE FARIA exited the front passenger seat of the Ford Fusion and entered the U/C vehicle. While inside of the U/C vehicle, DE FARIA sold CW-1 two 9mm pistols and ammunition for $2,700 government funds. CW-1 left the area and was kept under surveillance to a pre-determined location. At the pre-determined location, CW-1 provided investigators with two (2) PMFs, 9mm pistols, with no serial numbers, and 64 rounds of 9mm ammunition. CW-1 and the U/C vehicle were searched again for contraband and currency with negative results. I have reviewed the recording of the transaction, which confirmed CW-1's account that CW-1 purchased the firearms and ammunition from DE FARIA.

12. During late May of 2024, CW-1 informed agents of communications with DE FARIA. CW-1 reported that DE FARIA sent photographs and videos of firearms that were advertised as available for sale. I have reviewed the photographs and videos sent to CW-1 and observed these media files to depict a suspected AR-15 style rifle, as well as commercially manufactured pistols and PMFs.

13. CW-1 reported to agents that DE FARIA stated he had a firearm source of supply in North Carolina and could acquire a rifle and two pistols for sale. CW-1 reported that DE FARIA advertised a price of $2,200 for the rifle, and $1,200 for each of the pistols. On June 4, 2024, CW-1 informed agents that DE FARIA told him/her that his associates were traveling to North Carolina to acquire the firearms. On June 6, 2024, CW-1 informed agents that DE FARIA told him/her that his associates were unable to acquire the firearms.

14. As part of the ongoing investigation, I have consulted with an ATF Industry Operations Investigator in the Boston Field Division, who has queried ATF's Firearms Licensing System ("FLS")." Based on a review of relevant records, DE FARIA does not possess a federal firearms license ("FFL").

15. In September 2024, several defendants, including DE FARIA, were arrested after numerous controlled buys involving firearms. Following these arrests, DE SOUZA contacted CW-1 and a family member separately. DE SOUZA threatened both CW-1 and CW-1's family due to CW-1's cooperation with federal law enforcement in this investigation. DE SOUZA claimed to be associated with Primeiro Comando de Capital ("PCC"). PCC, originally founded in the prison systems in São Paulo, Brazil, is one of the largest criminal organizations in Brazil and Latin America. PCC members and their associates have been known to commit violent offenses in furtherance of the organization, to include murders, armed robberies, kidnappings, and the coordination of a transnational drug trafficking operation.

16. Following the threats made to both CW-1 and CW-1's family member, ATF agents debriefed both individuals.

17. CW-1's family member informed agents that, on or about October 10, 2024, he/she reported he/she returned a phone call to DE SOUZA at the phone number 774-552-0412.

CW-1 and his family member reported that they have known DE SOUZA for several years and described having an amicable relationship with DE SOUZA prior to this incident. The family member recorded the phone call with DE SOUZA based on safety concerns. The conversation with DE SOUZA was in Portuguese.

18. During the call, DE SOUZA stated that CW-1 and CW-1's family were in trouble. DE SOUZA stated CW-1 had a vehicle equipped with cameras and set up an individual who was then arrested. DE SOUZA did not provide the name of the individual. However, in a subsequent conversation with CW-1, DE SOUZA stated that CW-1 was responsible for the arrest of "Tales" – which I believe is a reference to DE FARIA. On this point, I have also reviewed messages on CW-1's phone in which DE SOUZA asked CW-1 if he/she knew "Tales." DE SOUZA stated that the individual got into a vehicle with CW-1 and the police arrested them with guns – when DE FARIA was arrested in September, investigators recovered two handguns. Based on these facts, and the ongoing investigation, I believe that the arrested individual referenced in the call with the family member is DE FARIA.

19. During the call, DE SOUZA stated that at least ten (10) guns were involved in the firearms trafficking conspiracy. DE SOUZA stated that he [DE SOUZA] has numerous associates within PCC in Brazil. The family member reported DE SOUZA referenced being in contact with a specific PCC member reportedly in an upper leadership role in the organization, as well as knowledge about the organizations drug trafficking operation. The family member reported DE SOUZA stated that DE SOUZA was tasked with investigating the situation for PCC and that PCC would decide on how to handle the situation with CW-1.

20. The family member reported that DE SOUZA told him/her that DE SOUZA was contacted by PCC members in Brazil and that the firearms associated with the arrested individual

6

(who I believe is DE FARIA) belonged to PCC.  DE SOUZA stated PCC demanded answers from CW-1 and DE SOUZA was directed to investigate CW-1 for PCC.  DE SOUZA stated CW-1 owed PCC $70,000 for the seized firearms.  DE SOUZA also stated that CW-1 needed to pay for the arrested individual's lawyer.  The family member reported DE SOUZA stated that PCC would retaliate against CW-1 and CW-1's family back in Brazil if they did not comply.  Per the family member, DE SOUZA knows where their family members are located in Brazil and in the United States.

21.     Per the family member, DE SOUZA told him/her that CW-1 needed to attend a meeting on this issue or they would make CW-1's family in Brazil pay for CW-1's actions.  The family member also reported DE SOUZA was adamant that CW-1 had to meet with DE SOUZA to explain why he cooperated with law enforcement.

22.     The family member informed agents that DE SOUZA stated the "big boss" [English translation per the family member] sent DE SOUZA a photograph of CW-1.  Per the family member, DE SOUZA stated if CW-1 does not fix things and meet with DE SOUZA, there would be a meeting on October 13, 2024, and PCC would pass judgment on how to handle CW-1.  Per the family member, DE SOUZA stated their family in Brazil would then pay for their actions – this was interpreted by the family member and CW-1 as a threat to harm other family members.

23.     During this investigation, a Massachusetts State Police Trooper, fluent in Brazilian Portuguese, reviewed the recorded call between the family member and DE SOUZA.  I have discussed the contents of the call with the Trooper and noted the statements made by DE SOUZA on the call were consistent with the family member's recollection of the conversation.  It

7

should be noted that, while the family member recorded one phone call, there were additional communications with DE SOUZA via WhatsApp.

24. In addition to the family member's communications with DE SOUZA, CW-1 reported he/she contacted DE SOUZA, via WhatsApp, with the associated -0412 phone number.

25. CW-1 reported that he/she received messages via WhatsApp from DE SOUZA in which DE SOUZA asked if CW-1 knew "Tales." In a separate phone call with CW-1, DE SOUZA referenced "Tales" in relation to CW-1's cooperation with law enforcement. As noted above, I believe that these references to "Tales" are references to DE FARIA. CW-1 reported DE SOUZA stated DE SOUZA had received a photograph of CW-1 and PCC members in Brazil had the photograph now. CW-1 reported DE SOUZA stated he had many connections to PCC members in Brazil and DE SOUZA referenced speaking with the "big boss." CW-1 reported DE SOUZA referenced speaking with PCC members in São Paulo, Brazil, specifically.

26. DE SOUZA told CW-1 that the guns sold by "Tales" belonged to PCC. DE SOUZA further stated that CW-1 needed to pay $70,000 for the guns or CW-1's family would pay the consequences from PCC. CW-1 reported DE SOUZA stated CW-1 need to pay for lawyer fees as well.

27. CW-1 reported DE SOUZA stated CW-1 needed to meet with DE SOUZA and others to figure things out. CW-1 reported DE SOUZA stated he was going to wait for a decision from São Paulo and he would let CW-1 know. Following the debrief, I reviewed WhatsApp messages between CW-1 and DE SOUZA. The messages appeared consistent with CW-1's recollection of the messages with DE SOUZA. It should be noted however, while the phone call between CW-1 and DE SOUZA was not recorded, CW-1's recollection of his/her

8

conversation with DE SOUZA was consistent with the substance of the family member's phone call with DE SOUZA.

28. Both CW-1 and his family member who had spoken to DE SOUZA expressed fear for their lives, as well as their family's lives, based on the threats made by DE SOUZA.

29. CW-1 and his family member provided agents with a photograph of DE SOUZA's WhatsApp account. Agents, to include myself, observed the WhatsApp account included a profile photograph. Both CW-1 and the family member separately identified the individual depicted in the profile photograph as DE SOUZA.

30. In February 2024, DE SOUZA was arrested by the Massachusetts State Police for charges to include operating under the influence of liquor. Following the debrief, CW-1 and the family member were separately shown the booking photograph associated with DE SOUZA's arrest. Both CW-1 and the family member confirmed the identity as DE SOUZA.

[Continued on Next Page]

## CONCLUSION

31.    In light of the above, there is probable cause to believe that Floriano DE SOUZA has conspired to Engage in the Business of Dealing in Firearms Without a License in violation of 18 U.S.C. § 371 as set forth above.

Eric Mercer
Special Agent, ATF

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by

HON. JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

on this __16__ day of October 2024